# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUL 29 2022

JEFFREY P. COLWELL
CLERK

Civil Action No. _____

(To be supplied by the court)

_____, Plaintiff

Philip A. Bralich, Ph.D.

v.

**Jury Trial requested:**
(please check one)
✓ Yes ___ No

See attached.

_____,

_____,

_____,

_____, Defendant(s).

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names of the defendants listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

## COMPLAINT

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

## A.    PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address.  Failure to keep a current address on file with the court may result in dismissal of your case.*

Philip A. Bralich, Ph.D., 2525 Arapahoe Avenue, E4-163, Boulder, CO 80302

(Name and complete mailing address)

(831)641-9610    pbralich@earthlink.net

(Telephone number and e-mail address)

## B.    DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B.  DEFENDANT(S) INFORMATION."*

Defendant 1:    See attached.

(Name and complete mailing address)

(Telephone number and e-mail address if known)

Defendant 2:

(Name and complete mailing address)

(Telephone number and e-mail address if known)

Defendant 3:

(Name and complete mailing address)

(Telephone number and e-mail address if known)

Defendant 4:

(Name and complete mailing address)

(Telephone number and e-mail address if known)

**C.    JURISDICTION**

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

✓
___    Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

See attached.
_____

_____


___    Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of _____.

If Defendant 1 is an individual, Defendant 1 is a citizen of _____.

If Defendant 1 is a corporation,

Defendant 1 is incorporated under the laws of _____ (name of state or foreign nation).

Defendant 1 has its principal place of business in _____ (name of state or foreign nation).

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3

## D.    STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

CLAIM ONE:    See attached. _____

       Supporting facts:

**E.    REQUEST FOR RELIEF**

*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

   See attached.

**F.    PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct.  *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

_____
(Plaintiff's signature)

  July 26, 2021
_____
(Date)

(Revised February 2022)

Philip A. Bralich, Ph.D.
2525 Arapahoe Avenue, E4-163
Telephone: (831)641-9610
Email: pbralich@earthli\nk.net

### UNITED STATES DISTRICT COURT – DISTRICT OF COLORADO

| | |
|---|---|
| PHILIP A. BRALICH, PH.D.,<br>         Pro Se Plaintiff,<br><br>vs.<br><br>DAVID BELL, DIRECTOR OF HUMAN<br>RESOURCES FOR THE CITY OF<br>BOULDER, CO., DAVID FARNAN,<br>DIRECTOR OF LIBRARY AND ARTS,<br>BOULDER PUBLIC LIBRARY, AND<br>JANE SYKES WILSON, STEVEN FROST,<br>SCOTT STEINBRECHER, BENITA<br>DURAN, AND SYLVIA WIRBA,<br>BOULDER PUBLIC LIBRARY<br>COMMISSIONERS.<br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) COMPLAINT, REQUEST FOR INJUNCTION,<br>) AND DEMAND FOR JURY TRIAL.<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### COMPLAINT, REQUEST FOR INJUNCTION, AND DEMAND FOR JURY TRIAL

COMES NOW, herein pursuant to Co. Rev. Stat. § 18-3-207 (2016) (Extortion), Colo. Rev.
Stat. § 22-1-27 (Defamation), Co. Rev. Stat. § 24-34-402 (Sexual Harassment), and; Federal
Criminal Statutes 42 U.S.C. 1981, 1981a, 1983, 1985, 1988, § 2000e. Sections 102, 230, 245,
270, 400, 703, 704 or 717, and Subsections 3631 and 14141, U.S.C. 18, Chapter 13, § 241,
§ 242, § 245, § 247 28 U.S.C. § 4101(1) (Civil Rights); and as per U.S.C. 18 § 1964(c) (RICO)
and referencing U.S.C. 18 § 1962(b) (Extortion) stating that the relevant state criminal laws
cited in a RICO Civil suit be included therein and pursuant to Co. Rev. Stat. § 18-3-207 (2016)
(Extortion) and the Federal RICO Act § 1962 (c) and (d); the pro se Plaintiff humbly and
respectfully submits this COMPLAINT, REQUEST FOR INJUNCTION, AND DEMAND
FOR JURY TRIAL. with the U.S. District Court of the District of Colorado to seek monetary
relief in the amount of $1,500,000 dollars trebled to $4,500,000 based on the RICO punitive
damages provisions for damages and injuries sustained through the depraved indifference

negligence of the named Defendants in a matter of Extortion through threats and acts of
Defamation as well as for injunctive relief in the form of both a preliminary and a permanent
injunction against the continuance of the speech and acts described in the following sections of
this complaint, humbly and respectfully written to the best of Plaintiff's pro se abilities in
conformance with the Federal Rules of Civil Procedure and the Local Rules of the District of
Colorado for addressing such matters.

## I. PARTIES NAMED IN THIS COMPLAINT:

**A.**    PLAINTIFF INFORMATION

The Plaintiff is a citizen of the State of Colorado.

Philip A. Bralich, Ph.D.
2525 Arapahoe Avenue
Boulder, CO 80302
Tel: (831)641-9610
pbralich@earthlink.net

**B.** DEFENDANT(S) INFORMATION.

All defendants are over 18, of sound mind and body, and citizens of the State of Colorado.

David Bell
Director
Human Resources Department
1101 Arapahoe Avenue
Boulder, CO 80302
hr@bouldercolorado.gov

David Farman
Director of Library and Arts
Boulder Public Library
1001 Arapahoe Avenue
Boulder, Colorado 80302
303-441-3100
farnand@boulderlibrary.org

Jane Sykes Wilson
Boulder Public Library Commissioner
Boulder Public Library
1001 Arapahoe Avenue
Boulder, Colorado 80302
303-441-3100

jesykeswilson@gmail.com

Steven Frost
Boulder Public Library Commissioner
Boulder Public Library
1001 Arapahoe Avenue
Boulder, Colorado 80302
303-441-3100
Steveefrost@gmail.com

Scott Steinbrecher
Boulder Public Library Commissioner
Boulder Public Library
1001 Arapahoe Avenue
Boulder, Colorado 80302
303-441-3100
scott.steinbrecher@ucdenver.edu

Benita Duran
Boulder Public Library Commissioner

Boulder Public Library
1001 Arapahoe Avenue
Boulder, Colorado 80302
303-441-3100
benitaduran1018@gmail.com

Sylvia Wirba
Boulder Public Library Commissioner
Boulder Public Library
1001 Arapahoe Avenue
Boulder, Colorado 80302
303-441-3100
sylvia.wirba@gmail.com

## II. BASIS FOR JURISDICTION, VENUE, AND STANDING:
### A. Jurisdiction.

This Court exercises Subject Matter Jurisdiction over this action under 28 U.S.C. § 1331 (Federal Question) (as per allegations arising from 28 U.S.C. 1343 Civil Rights, 18 § 1962(b) and § 1964(c) (RICO)), 18 (RICO) and 28 U.S.C. § 1367(a) (Supplemental Jurisdiction), and noting the amount in controversy exceeds the required $75,000 limit exclusive of interests and costs as Plaintiff is seeking to recover $1,500,000 in damages from the Defendants, trebled to $4,500,000 under the punitive damages provisions of the RICO statutes .

This Court also exercises personal jurisdiction as all Defendants are residents of Colorado and employees of a State of Colorado municipal public library.

### B. Venue.

Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) as all of the Defendants reside and pursue their careers in Colorado.

### C. The Fed. R. Civ. P. 8(a)(2) Short and Plain Statement of the Claim for Relief[1].

---

1 The "short and plain" statements required by Fed. R. Civ. P. 8(a) as presented in subsections "C" and "D" of this Section II of the Complaint may be a bit longer than those written by trained and licensed attorneys, but the Pro Se Plaintiff has made every effort to keep them as short as possible. However, having been both impressed with and intimidated by the complexities and controversies and the concomitant impossibility of writing a shorter claim in such a complex matter as this one in the light of Twombly/Iqbal requirements surrounding the crafting of such statements in discussions in scholarly, legal works, the Plaintiff was unable to confidently reduce their length any further. The Plaintiff humbly and respectfully apologizes for any undue burden this may impose upon the Court and the Defendants.

The Plaintiff humbly and respectfully, pro-actively, and out of an abundance of caution and years teaching essay and research writing to beginners argues that the spate of Twombly/Iqbal articles within the legal profession among attorneys, judges, and professors expressing profound confusion within the profession about how to meet or judge whether claims meet those standards clearly attests to the fact that  those without legal degrees, let alone those without advanced degrees, or even simple four-year college degrees may not reasonably be expected to understand or meet those standards, and thus, Twombly/Iqbal represents a violation

This complaint seeks injunctive and monetary relief according to the Co. Rev. Stat. § 18-3-207 (2016) (Extortion), Colo. Rev. Stat. § 22-1-27 (Defamation), Co. Rev. Stat. § 24-34-402 (Sexual Harassment), and; Federal Criminal Statutes 42 U.S.C. 1981, 1981a, 1983, 1985, 1988, § 2000e. Sections 102, 230, 245, 270, 400, 703, 704 or 717, and Subsections 3631 and 14141, U.S.C. 18, Chapter 13, § 241, § 242, § 245, § 247 28 U.S.C. § 4101(1) (Civil Rights); and as per U.S.C. 18 § 1964(c) (RICO) and referencing U.S.C. 18 § 1962(b) (Extortion) stating that the relevant state criminal laws cited in a RICO Civil suit be included therein and pursuant to Co. Rev. Stat. § 18-3-207 (2016) (Extortion) and the Federal RICO Act § 1962 (c) and (d) for demonstrated threats and acts of defamation against the City of Boulder Human resources Department Director and the Boulder Public Library Director and Commissioners for having failed to properly hire, supervise, and discipline employees of the Boulder Public Library who have engaged in reckless threats and acts of defamation and extortion using all four forms of per se defamation in a coordinated effort to deliberately ruin the career and reputation of the Pro Se Complainant and likely many others in violation of the policies and procedures of the City of Boulder and the Boulder Public Library as well as City, State, and Federal laws and outside of their resumes and job descriptions as described in the following. As stated below these threats and acts of all four forms of per se defamation likely originate in a similar problem arising from the Boulder headquarted contemplative Shambhala/Naropa community against whom a related case has been filed as Bralich v Gayner, et al, Case No. 1:21-cv-03800 in this same Court.

## 2. The Particular Roles of the Defendants.

As the acts of defamation include and are particularly focused on but are not limited to all four categories of pro se defamation, under Colorado defamation laws, they do not need to be plead with particularity. "The only claims of defamation which may be maintained without allegation and proof of special damages are claims of libel per se, or some claims of libel per quod. Fort v. Holt, 508 P.2d 792 (Colo. App. 1973)." .Rule 9 - Pleading Special Matters, Colo. R. Civ. P. 9.

---

of the 14th Amendment by making access to the Courts available to an elite within the legal profession alone while excluding all Pro Se litigants.

The involvement of the full set of named defendants is demonstrated through their personal, active participation in the harassment, the dissemination of the story lines, and their egregious and adamant unwillingness to make efforts to query the Plaintiff or other victims concerning the truth or falsity of it all, the complete disregard of a search for evidence such as a request for a resume, a refusal to use common workplace devices of investigating the Plaintiff's background and references even when his resume (an academic Curriculum Vitae) had been commonly sent to many of the job openings he applied for within the Naropa/Shambhala community. These were met with further scoffing and defamation and the reiteration of the falsified biography instead. All of this in spite of not only state and local laws, their own policies and procedures and even the spiritual vows in the case of the originators of this dynamic at Shambhala/Naropa had taken to defend such victims rather than exacerbate the perpetration.

In short, the Plaintiff is not suing the Boulder Public Library or the Commission, he is suing a shadow administration and criminal enterprise used to engage in multiple, even countless, acts of extortion via threats and acts of defamation of those who are organized to conspire to contemptuously defy the policies and procedures they are legally required to support.

**D. Short and Plain Statement of Relief Sought.**

The Plaintiff humbly and respectfully seeks monetary and injunctive relief for damages and injuries sustained through the above described torts and crimes, as well as for punitive damages due to the egregiousness and Depraved Indifference of the threats and acts of harm of the Defendants.

The monetary relief sought is to compensate for the hundreds of thousands of dollars in lost wages, lost career advancements and awards as well as in the lost value in self-esteem and reputation in terms of those lost wages and professional opportunities, pain and suffering in terms of diagnosed PTSD, stress, and anxiety, and damage to his family, social and professional life, and the loss of the benefits and enjoyments thereof which are calculated on the basis of those losses and doubled to compensate for the pain and suffering just described and further detailed in Section III of this Complaint.

Specifically, the Plaintiff humbly and respectfully calculates compensation in the form of monetary relief in the amount of $1,500,000 for lost wages and professional opportunities which he doubles for the pain and suffering to $3,000,000 and then multiplies this number by three as per the RICO statutes (justified in section X) to $9,000,000.

The Plaintiff further justifies this amount by citing the rarely granted RICO punitive damages allowed in cases of crimes of such a deliberately malicious and egregious nature as to defy the norms of any civil society beyond a level that could be reasonably tolerated by its citizens and residents as evidenced in overt statements to that effect as well as the snickering and taunting that accompanied the crimes and torts both at the times and places of their perpetration as well as when witnessing the Plaintiff's misery and protests at his plight.

Injunctive relief is sought in the form of both a Preliminary and a Permanent Injunction against the continuance of the speech and acts described.

In addition, passive witnesses to the above, most of whom are highly educated with both post-secondary and some with graduate degrees and civil servants who would be expected to have a duty to prevent the abuses, defend the Plaintiff, or at the very least explore the validity of the sometimes bizarre but always patently false statements concerning plaintiffs background, orientation, and professional standing, not only breached that duty but in many cases took pleasure in the Plaintiff's plight as exhibited in grins and snickers at the Plaintiff's protests and discomfort at what was obviously serious harm to his life and career directly affected by the defamation and extortion.

Of note, the Pro Se Plaintiff humbly and respectfully requests that the injunction requested as part of the relief demanded in this complaint be ordered in the form of a temporary injunction until such time as this matter can be properly adjudicated.

**E. Standing to File Suit in Federal Court.**

According to the minimal constitutional standing required to bring a suit in Federal Court specified in Article III of the Constitution, the description of the facts in Section III. STATEMENT OF CLAIM of this Complaint clearly demonstrate that: a) the Plaintiff has suffered "distinct and palpable injury" as just described, b) that said injury is directly traceable to that illegal conduct, and 3) that the award of monetary damages for monetary losses and the addition of punitive damages for pain and suffering and to compensate for the egregiousness of

the offenses as well as for both a Temporary and a Permanent injunction to prevent the continuation of the illegal activities will naturally address and redress the injury. In addition, the grievances described herein pertaining to the Plaintiff address specific violations of Civil and Criminal Statutes, and the specific grievances described concern injury to the person of the Plaintiff alone and are real, palpable, and on-going.  Thus, standing to bring this Complaint in Federal Court is clearly demonstrated and established.

In addition to the specific requirements of Article III just addressed, courts have subsequently developed a set of further considerations to limit standing in federal court to prevent a plaintiff from pursuing generalized grievances and "abstract questions of wide public significance" and speculative claims of injury that are conjectural or hypothetical rather than real and immediate; however, as also demonstrated in Section III of this Complaint and Request for Injunction, the grievances described address specific violations of Civil and Criminal Statutes, and while the matter does concern a wide public significance similar to a wide presence of organized crime in corporations or communities, the specific grievances described concern injury to the person of the Plaintiff alone and are real, palpable, and on-going.  Thus, standing to bring this Complaint in Federal Court is clearly demonstrated and established.

**F. Statutes of Limitations.**

In the case of the Boulder Public Library Director and Commissioners, the statutes of limitations have not been exhausted for those torts and crimes perpetrated beginning in July of 2021 and as this problem is on-going, and there has yet to be a final act, the actual date for the commencement of the calculation of the statutes of limitations cannot yet be calculated.

The Supreme Court has described the continuous acts of the continuing offense doctrine as an unlawful act or series of acts "set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy." The continuing offense doctrine disbars Statute of Limitations challenges as they function to delay the running of Statutes of Limitations for continuing crimes by postponing the completion of those crimes and the commencement of the Statutes of Limitations until the completion of the last act in the series.

Finally, it is also argued later in the complaint that the allegations in this complaint are so widespread and so well-known within the Boulder community as to license a request by the Plaintiff

for the invocation of Rule of Evidence 301, Presumption, as an instruction to the jury and a demand
for immediate move to a jury trial.

## III. FULL STATEMENT OF CLAIM:

As new resident of Colorado beginning June 30, 2021 and continuing to the present, the
Pro Se Plaintiff has been availing himself of the Boulder Public Library to use the publicly
available computer facilities on the 2nd floor to write his books and pursue other online and
offline activities from three to four hours a day to maintain his career and his lifestyle. This was
begun in late July of 2021 and continues to the present. During that time, he has been subjected
to the same forms of harassment and civil rights violations that he has experienced since 1983
within the Shambhala/Boulder community which has its headquarters in Boulder, Colorado, and
for which the Pro Se Plaintiff has an on-going Civil Complaint now before the United States
Appellate Court of the 10th Circuit (Bralich v Gayner, et al. No. 1:2020cv03800). The
harassment and related torts and crimes are nearly identical to what was described in that first
complaint but in this case is being perpetrated by city employees of the Boulder Public Library,
very likely having taken instruction and information from the Shambhala/Naropa community.
For this reason, the following restates much of the Shambhala/Naropa complaint (Bralich v.
Gayner, et al) to describe the torts and crimes being complained of as well as for the basis for
the claim for relief.

To wit, the defamation and extortion coming from the Boulder Public Library close
parallel all those that originated in the Shambhala/Naropa community. Specifically, and citing
extensively from the Bralich v. Gayner complaint, since 1983 to the present with specific dates
and locations partially outlined in Exhibit "A", the Plaintiff's resume, which lists all the dates
and places of his employment and illustrates gaps in that employment, the Plaintiff has been
subjected to an ever growing and elaborated pattern of Extortion and Coercion through threats
and acts of Defamation based on threats and acts of creating a falsified biography of the
Plaintiff in order to compel him to commit acts of both a legal and an illegal and sexual and
nonsexual nature such as but not limited to participation in the extortion by defamation against
others and unwilling participation in closeted homosexual acts against his will by a criminal
enterprise operated by and among the Defendants in a well-organized subculture within their
legally organized institute that has damaged the Plaintiff in his ability to earn wages appropriate

to his education, training, and experience, deprived him of family, social, and professional
cohort and the privileges and advantages normally derived therefrom and initiated and
exacerbated physical and emotional suffering through deliberate and malicious patterns of false
statements, threats, and acts begun within the Shambhala/Naropa community that far exceed the
bounds of what can be tolerated in a civil society. The threats also indicated that these acts
against the Plaintiff required him to taking jobs and socialize with positions and cohorts well below
or outside of the plaintiffs work history, and included social engagements with those the plaintiff
found to be repugnant as well as unwanted closeted homosexual encounters in restrooms and other
secluded areas, and the possibility of becoming a victim of homosexual rape, physical violence, and
even murder if he were not to comply.

Specifically, the Plaintiff has sustained personal injury, property damage, and damage to his
reputation over the course of his career as particularized below in Section IV of this complaint in
terms of lost wages and professional opportunities, pain and suffering in terms of diagnosed PTSD,
stress, and anxiety, and damage to his family, social and professional life and the loss of the benefits
and enjoyments thereof through a scheme of Extortion and Coercion by threats and acts of
Defamation perpetrated by the Defendants in order to coerce the Plaintiff to perform said acts
against his will as well as to admit to crimes he did not commit, a criminal background he does
not have, a communicable and heinous, "spiritual" disease which can only be treated with acts
of sexual perversion, and to a sexual past, current interests, and proclivities he does not have, all
of which also constituted sexual harassment and Civil Rights violations under Federal Title IX and
Colorado State laws. The falsified biography of the Plaintiff denied and reversed the realities of his
hard earned, good reputation and professional achievements and indigency, was riddled with
outright statements and subtler but clear innuendo concerning criminality, deviancy, violence
even murder, being a potential menace to the community, and an angry confrontationalism that
he does not possess that created a public fracas and a situation of great public concern. The falsified
biography was disseminated with a negligence attaining to the degree of Depraved Indifference
among many and was perpetrated by the individual Defendants named in the Caption of this
Complaint.

This negligence was demonstrated through concomitant sadistic scoffing, chatter, grins, and
laughter as well as an immediate repetition of the defamation or shaming behaviors without any
attempt to ask the defendant, the sources, or plain common sense about the truth behind the
defamation, mobbing, bullying, and shaming behaviors. These threats and acts of defamation began

9

in 1984 and have continued since with regular embellishments, the most notable of which were updates based on the Plaintiff's changing home and work environments as well as his achievements over the years all of which embellishments were based on claims that the Plaintiff was "on the run" avoiding prosecution or hiding from those he had criminally offended and the achievements were all said to be lies or an artifact of cheating, fraud, and theft. Criminal enterprise is demonstrated through the multiplicity of other victims of the same mobbing and bullying techniques, the coordinated nature of the acts and the commonality of the story lines, and the common themes and alleged acts, widely known cliques of offenders in well-placed positions to affect acceptance and rejection and to coordinate story lines - common themes concerning unwritten but necessary requirements for position many of which include particular sexual acts.

In short, based on the deliberate pattern of hiring, refusing to supervise employees in this regard, and failures to discipline them for such abuses, employees at the Boulder Public Library and likewise elsewhere in the City of Boulder Departments, and for failure to adhere to and enforce sexual harassment policies and related anti-discrimination laws in hiring, supervising, disciplining, and the dismissal of staff (other than security), this complaint addresses legal matters of on-going and near relentless defamation and sexual harassment on the part of many of the Boulder Public Library staff (not including security) and some patrons whom they have managed to infect with their pretenses to authority and the faux-credibility of the defamatory storylines that mirror and repeat those of the allegations in Bralich v Gayner which have utterly ignored and been contemptuous of my efforts to correct their content and arrest the harassment.

This harassment has significantly embarrassed and compromised the Pro Se Plaintiff professionally, socially, and within his family, and with the patrons and other less demented library employees and through its deliberate spread to those patrons throughout the Boulder community as well as exacerbating and continuing the defamation originally engendered by a large, organized shadow network of abusers among followers and administrators within the Shambhala/Naropa community.

A. Supporting Facts.

The defamation and sexual harassment include false accusations and explorations of past and current sexual history, personal orientation as well as of criminality, some seemingly designed to be as deliberately compromising as possible and to make the sender appear as

reprehensible to the general public as possible without the slightest mention of or interest in evidence or of the laws and policies and procedures against such things. A pretense to "someone said" and "everyone knows" suffices for them, and statements concerning pretenses to some form of "special" insight indicated by their assertions that "we can tell."

"Sextortion" is always present when a squawker asserts, "We'll say, '[X]'" which is only and always delivered when an effort at illicit prying and meddling into a target's life was met with a refusal to comply. The statement that follows "We'll say," is always sexualized slander excused by pretending that the squawkers have no choice in the matter because the squawker and his/her coterie were backed into a corner because their illicit prying was not met with the answers they want, and they are now "forced" to guess and punish the target with defamatory conjecture.

As is well-known, a library science degree does not come with any of a license to practice medicine, psychiatry, or psychology, and such employees are unlikely to have any relevant competence in those areas and would be no more and no less neurotic than any of their patrons. When they cross the line into seeing and presenting themselves as self-made, cat-calling counselors as they regularly do, they must be reminded to stop, and if they fail to do so, supervisors should be notified. No one goes to our public institutions for unwelcome, unwanted, and unnecessary counseling by those who are no more qualified in that regard than the rest of those gathered there.

In addition, there is also no reason to suspect they have law enforcement training, law degrees, or experience as a prosecutor, so all must reasonably conclude their assessment of good guys and bad guys is as clumsy and foolish as anyone else without the requisite training. As trained civil servants and responsible adults, however, they should know to discourage all such foolish speculation, gossip, and cat calling and not to encourage or participate in it. They should also know that if any of that is of a sexual nature it constitutes actionable harassment.

As for the origination of the problem within the Shambhala/Naropa community as the probable source, there was a community interactive program within the psychology program at Naropa that had to be cancelled in the early to mid-eighties about the time of the beginning of the harassment and stalking of the Pro Se Plaintiff because of the tremendous abuses of it that resulted. The program involved "Community Based Treatment" of schizophrenics through large

networks of friends, family, and therapists dedicated to the well-being and care of those enrolled.

The abuses included naming strangers and competitors as schizophrenics enrolled in the project as a kind of frat-boy prank or from the delusions of local, new age kooks which soon erupted in many actionable cases of slander that spread throughout the Boulder community. Equally as many also pretended to be "therapists" or members of the support team in the program who named anyone they didn't like as enrollees putting the university at risk. I believe it was headed by a professor named Edward M. Podvoll, author of the book, _The Seduction of Madness_.

Many of the local and Naropa new age kooks and guru wannabes think the program still exists, many pretend it still does to con others, and many still accuse those they do not happen to like or competitors of being clients in the program as well as name their fellow kooks, many of whom have not cracked a book since high school or are barely out of high school, as therapists or "official" team members.

They abuse and threaten their "clients" who in reality are targets for abuse, with malicious, unsupported and unsupportable gossip of the most tawdry sort in order to get others to comply with their personal and social agendas and career goals and within the workplace to advance themselves and demote their competitors using these techniques. Their targets for this form of abuse are generally ordinarily competent people who simply refuse to engage in such illegal activity and are thereby vulnerable to it.

Particular to this case is the fact that faculty, staff, and followers from within the shadow network with the Shambala/Naropa community just mentioned regularly travel to several, large group retreat centers and to many smaller local centers across the country and across state lines wherein they proliferate both the particular storylines of their defamation and the names and locations of their victims as well as the techniques of this form of harassment for the advancement of the perpetrators and those who would like to join them.

The Shambhala/Naropa community consists of over two hundred centers in the U.S., Canada, Western Europe, and a few in Mexico and South America, 4 land centers for group retreats with mixes of participants, faculty and staff from all centers, and a University. Very active on-line presence for many online participants and all of the members from all the centers.

12

There are countless smaller Facebook groups and Zoom Meetings, all of which offer a wide variety of participation for those interested from all centers.



The following article reference concerns support for the widespread existence of this dynamic of sextortion, extortion, stalking, and harassment as well as FBI efforts to stop "sextortion" and related criminal activity is listed to help explain the matter and establish the wide-spread nature of it. The article is simply titled, "Sextortion" and provides a basic description of the phenomenon and is found at https://www.fortinet.com/reso.../cyberglossary/sextortion.

This article does not mention the more common form of sextortion among adults where the predators claim to have embarrassing evidence when there actually is none, and the threat is to spread the rumor far and wide that there is. Adults concerned about their families and careers may give in to the sextortionists if the predators can spread the rumors far enough.

These scams require a more concerted effort and often a fair amount of stalking and a number of such grifters to be effective, but if they convince a few victims to give in, they can grow the network of stalkers and grifters and greatly increase the number of victims by pointing that out to them. Greater evidence of their effectiveness to threaten others with is recognizable victims that they have already ruined. The stalkers will reach out to members of the victim's family, his/her friends, and colleagues to seek out details that can be twisted into sextortionist scenarios to be used against the victim. The details they use can be quite benign in reality, but after the predators get through with modifying them, they can seem quite heinous and will have a thread of truth underlying the distortions.

13

If the predators are aware of the dynamics of workplace and academic mobbing and bullying, they can create a particularly effective network of stalkers and sextortionists that can take over entire corporations or academic institutions by using the techniques that are being described in academic literature designed to heighten awareness of the problem and increase lawsuits, corporate policies, and new legislation to end the problem. This literature highlights the fact that victims of crimes who suffer from PTSD make especially good targets for stalking and Sextortion and they will use their success with previous victims to frighten others into compliance. None of them have the least concern about what it is true. Their only concern is for what is juicy. If it's juicy it will spread like wildfire and endure for years. If they hear anything that contradicts what is juicy or true they turn a deaf ear without bothering to consider it.

In addition, the grifters of sextortion frequently pretend that their targets are somehow complicit with them in the matter and somehow want, need, or deserve to be sexually harassed and slandered. In the more bizarre cases, they claim the victim has given them formal, written permission or is secretly orchestrating it all. Continuing in these behaviors only makes them worse, yet they insist it has, does, and will continue to pay off in social and career benefits for themselves and those who join them in their campaign of harassment against their designated targets.

In the matter of Bralich v. Gayner referenced earlier as a complaint concerning the source of the problems mentioned here and which is now before the federal appellate court, centering around an evidenced matter of violations of civil rights and extortion via threats and acts of all four forms of per se defamation, retaliation and punitive measures against a complainant, a case that has also been referenced in 2 clear cases of bankruptcy fraud: a) naming a non-creditor as a creditor to invoke the bankruptcy automatic stay for personal gain and b) having the filing signed by an unauthorized individual, this complaint continues to protest and seek redress concerning this clear case of on-going extortion and sextortion by the named university and religious community with these over 200 centers across the United States, Europe, and Canada who for years have been plagued by the influence of an organized shadow network of administrators, faculty, and followers who advance themselves and remove competition through threats and acts of all four forms of per se defamation.

14

The bankruptcy petition was filed with the Colorado Bankruptcy Court and is called, Drala Mountain Center. The number is 22bk10656. Both trustees (Samuel Boughner and Joli Lofsted as well as the Department of Justice Bankruptcy Fraud division have received complaints concerning both the issue of naming a clearly documented non-creditor as a creditor to invoke the automatic stay for personal gain and the fact that the signer of the petition is not qualified to have done so.

The Bralich v Gayner complaint was initiated following an attempt to complain of the above described abuses within that community using their newly enhanced complaint procedures and policies of 2018. However, in the case of the Pro Se Plaintiff's complaint, which was at first pursued as described it ended in a falsified investigation by "Care and Conduct Officers" who existed only on paper, without any knowledge or participation on the part of the complainant and which ended in a punitive and retaliatory judgment against him.

While the complaints and follow ups sent to the Naropa University Title IX Officer were completely ignored the email exchanges with Shambhala Mountain Center and the Shambhala International Care and Conduct Committee at first went well but then resulted in retaliation against the Plaintiff when Mr. Gayner, either on his own or in conjunction with a Mr. Peterson, of the Shambhala Mountain Center Care and Conduct Officers and the Shambhala International Care and Conduct Committee when Mr. Gayner informed the Plaintiff that he was no longer allowed to participate in programs at Shambhala land centers as the relevant parties had decided he now represented some sort of a menace to the community for having filed a complaint. This was explicitly stated and constitutes very direct evidence of retaliation. At the same time, all correspondence from the Shambhala parties with the Plaintiff was abruptly cut off mid-process without explanation.

Plaintiff then filed the letter of intent to litigate (Exhibit B) with conditions to be met including the payment of monetary damages and the addition of modifications to their harassment policies within the one-year deadline of the statutes of limitations. As there were only two phone responses to the letter of intent which denied any and all wrong doing, the current action represents the fulfillment of the promise to litigate which also falls within the statute of limitations.

The email exchange as recorded on my email provider site provides sound evidence of all these abuses, and the Courts have my side of the email exchange which clearly shows that

Gayner falsified the investigation and it's result either himself or between him and Peterson and that the SMC Care and Conduct Officer(s) who should have conducted the investigation didn't even exist except on paper.

If anyone were to press Gayner and Peterson on the matter, they would find exactly the same email evidence or would get a denial of their existence or a "can't find them" response, but pressing them on it will end the problem by showing they should have been fired long before the bankruptcy and before the Bralich v Gayner lawsuit.

The only possible reason they would have for falsifying that investigation and the judgment would be because those named in my complaint were clearly guilty. The punitive and retaliatory judgment they took without cause and without following policies and procedures makes it all even worse.

To add crime onto crime, Gayner's naming me as a Creditor in the petition for bankruptcy when they have never owed me a dime in order to invoke the automatic stay to end Bralich v Gayner is clear and serious fraud of the bankruptcy court and was clearly done for his and the other named defendants' personal gain as SMC is not named in the lawsuit.

The RICO conspiracies that comprise these loosely organized hierarchical structure of shadow administrators and shadow followers is evidenced more clearly in the 2021 Annual Report by Shambhala which ignores entirely that their senior teachers, the Shastris and Acharyas were defrocked as a result of the agreement referenced in the quote below and can no longer serve as preceptors for vows, give reading transmissions, empowerments, or any other related activities as preceptors due to their efforts to not only oust the established and recognized leader through the above described harassment, but also through their efforts to sever all ties with the three legitimate Buddhist lineages and to establish "something new" which puts them "in charge" and without any responsibility to adhere to the dictates of legitimate Buddhist organizations.

The quote below claims demonstrates their devious efforts to hide these facts and yet get away with them. They express appreciation of the lineages they broke with, but do not mention they have broken with them, and that's why the senior teachers were defrocked. It then welcomes those who are interested, especially donors of course, to the lineages with which they have broken giving the impression that not only have they not broken with them, they are still legitimate representatives for them. Thus, it is in no way anything other than an informal

welcome into the new age trip they have dreamed up in defiance of the discipline, practice, and study required by Shambhala and Buddhism and in no way the voice of any of the lineages. This is quite deceitful and likely good enough for the donors and members to sue and for the granting authorities to back off because they were not informed that the lineage is broken and the Shastri's and Acharyas were defrocked and cannot enter anyone into the lineage via vows and obligations.

They also fail to mention Bralich v Gayner, the Gayner/Peterson incident and the fact that Gayner, the Care and Conduct Committee, and the Shambhala Board (the authors of the Annual Report) should all have stepped down or been fired for failing to address the Gayner/Peterson incident and failing to fire both as well as the five senior teachers named in the complaint (including, Cashman, Simmer-Brown, Spiegel, & Quigley) as required.

They also ignored demands that they step down and demands that that they Cease and Desist the negotiations to break with all three lineages (Shambhala, Kagyu, and Nyingma) leaving their "Nouvelle Shambhala," or "Shambhala-Butch" as nothing more than a new age cult that expresses appreciation for Buddhism and Shambhala but simply does not care to adhere to anything the lineages require or have to say about the matter. They can now, if they wish, add Anton LaVey, Aleister Crowley, Ayn Rand, Tarot Cards, runes, seances, and break dancing to the curriculum and continue to pretend it is somehow aligned with Buddhism and Shambhala and that anything they do is sanctioned by them. Maintaining the name, which is all they have left, also sounds better than "Goofy Spiritual Ideas" from the defrocked folks at "New Age Kooks and Guru Wannabes" where adding "and Psychic Fair" after every use of the word Shambhala would like aid them in their marketing efforts.

Here is the quote:

As announced in the recent Joint Statement on Mediation Settlement, on December 21, 2021 the Shambhala and Sakyong Potrang Boards agreed to settle the mediation process begun in August, 2021. This agreement creates a more independent Shambhala Board, gives Shambhala a license to continue to use the trademark "Shambhala" and leaves open the possibility of further communication. The Shambhala Board followed up on this with the communication Moving Forward As A Community Post Mediation.

As was stated in this letter

It has been close to four years since the crisis in Shambhala began and during this time it often felt like the direction of the organization was on hold. We have all had to examine our connections with Shambhala and the lineage in ways that were personal and often uncomfortable. Now with this agreement in place, we can turn our attention to moving forward as an organization, as a

> community, and as individuals. After a long period of uncertainty, we feel excited
> about what may now arise. We hope you will join us as we continue to strengthen
> our dharmic paths and together establish a Shambhala that reflects the elements
> of a good human society, for the benefit of all.
>     As a guiding principle, the Shambhala Board affirms its
> commitment to Shambhala as an inclusive society, welcoming all
> students within the dharmic streams of the lineage of Sakyongs - past,
> present, and future. We look forward to growing and evolving as a
> community and organization so that we can be together in ways that are
> even more supportive, genuine, and kind. We also affirm our deep
> commitment to the spiritual paths of the Shambhala, Kagyu, and
> Nyingma traditions and our plans to continue to practice, teach and
> study.

The Pro Se Plaintiff began this litigation with a Letter of Intent to Sue in an attempt to

avoid the complications and expenses of a Court matter, but this letter went unanswered. It is

attached as Exhibit B, but the list of demands from that letter are quoted below for convenience

of the readers of this complaint.

> 1. The Library Commission shall see to it that relevant employees are disciplined
> according to Boulder Public Library's standard policies and procedures and all relevant
> laws as well as to correct the errors concerning sender's comportment, qualifications and
> background within relevant administrators and employees including security and as far
> beyond as possible.
> 2. Prevent future harassment and address specifically and directly the problems of
> scapegoating, mobbing and bullying, sexualized gossip, slander, and shaming behaviors
> throughout the administration and staff.
> 3. Compensation in the amount of $150,000 in lieu of the $1,500,000 demanded in the
> Civil Suit for damage to career and social life as well as pain and suffering due to the
> mischaracterizations and defamation and the egregious unwillingness to prevent or
> address same as dictated by written policies and procedures.
> 4. Develop a systematic plan to support and educate victims and potential victims of this
> form of sexual harassment and abuse.
> 5. Develop a public campaign to heighten awareness that the abuses outlined engender,
> support, protect, empower, and legitimize actual abusers while traumatizing their victims
> with further abuse and misunderstanding.
> Please be advised that if I do not receive a response to this letter by July 21, 2022, I will
> file the complaint with the Federal Court.

## B. Negligence and Depraved Indifference.

The torts and crimes alleged in this Complaint are of both an accidentally and a

deliberately negligent nature in that all of the perpetrators and the witnesses had a clear duty

that any reasonable or prudent person would have in regards to the witnessing of or perpetration

of the proliferation of such extreme and blatantly flagrant threats and acts of public degradation,

insult, and extreme accusations made of the Plaintiff who was clearly hurt, embarrassed and

concerned about the damage to his reputation, family, social, and professional life and was

clearly protesting and trying to correct the cruelly unfair misinformation, the

mischaracterizations of his person, deportment, and performance and past in general and the indecency, indignity, and crudity of the treatment he was receiving from so many of the community. It was also clear to all that deliberate harm was intended to the Plaintiff in those ways for his refusals to violate his personal integrity and values and the laws of man and God as arbitrarily assigned to and imposed on him by the most active perpetrators.

The torts and crimes described herein not only clearly indicate accidental and deliberate negligence in the breach of duties expected of any mature adult in a civilized society, they raise to the level of Depraved Indifference. To constitute depraved indifference, a defendant's conduct must be "so wanton, so deficient in a moral sense of concern, so lacking in regard for the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes a crime." Depraved indifference focuses on the risk created by the Defendant's conduct, not the injuries actually resulting. The negligence and indifference is patently obvious in the mere description of the threats and acts, but the Depraved Indifference becomes apparent in the snickers, guffaws, sadistic grins, and taunts that accompany the threats and acts themselves as well as present themselves in reaction to the Plaintiff's obvious pain and suffering in response.

The duty to act in the Plaintiff's support and defense was plainly one that anyone would be expected to exercise both for the good of the immediate, corporate and political party communities they claimed to be in support of and working to promote and enhance as well as toward the larger community of the U.S. citizenry and government as well as toward the Plaintiff himself who was obviously being victimized, and whose protests and objections to the treatment he was receiving were constant, articulate, and detailed as he attempted to address, prevent, and reverse all the illegal threats and acts being imposed on him in person, through social media, and through email and the mails in distributing his resume to responsible parties.

In addition, it is undeniable that the acts of Sexual Harassment, Defamation, and Extortion, and the breaches of duty to prevent same were the direct cause of the damages to Plaintiff's career, family, social, and professional life as the acts of Defamation and extortion were presented as truthful and explained why the true cause for limitations in the Plaintiff's life rather than the result of defamation.

Passive witnesses to the above, most of whom are highly educated with post-secondary degrees who would be expected to understand and exercise the duty to prevent the abuses,

defend the Plaintiff, or at the very least explore the validity of the sometimes bizarre but always patently false statements concerning the Plaintiff's background, sexuality, and professional standing, not only breached that duty, but in many cases, they took pleasure in the Plaintiff's plight as exhibited in grins, snickers, and taunts at the Plaintiff's protests and discomfort at what was obviously serious harm to his life and career directly caused by the perpetrated torts and crimes.

With the stated and expressed purpose of harming the Plaintiff socially and personally in his person through exposing him to the possibility of physical and sexual violence as well as in his family, social, and professional life through speech and acts of defamation and harassment with deliberate indifference demonstrated in overt statements as well as the snickering and taunting that accompanied the orally delivered threats and acts of the crimes and torts at the same times and the same places of their perpetration or later upon viewing the Plaintiff in visible distress and in protest of the matter in dates and places described in Plaintiff's resume and other sections of this complaint, contrived, determined, and caused such harm and demonstrate the deliberate negligent nature of these breaches of the duties toward the preservation of justice and the protection of the innocent that extends to all members of a civil society.

## C. Citing Colorado Extortion Laws.

In Colorado, the unlawful threatening of another to perform an otherwise lawful act is only one form of the crime of Coercion as defined by the Colorado Penal Law, which constitutes, the misdemeanor offense of Coercion in the Second Degree. The other is the use of threats to compel another to perform acts they *have no legal right to do*, such as a) commit or attempt to commit a felony; b) cause or attempt to cause harm to another's person or property or c) violate his or her duty as a police officer or public servant. For this conduct, Colorado prosecutors may charge the D Felony crime of Coercion in the First Degree and seek substantially more severe penalties.

The acts of extortion experienced by the Plaintiff at the hands of the Defendants and described in Section III STATEMENT OF CLAIM of this Complaint were perpetrated by dozens of actors and against the Plaintiff and other victims as the prime source of their hiring and advancement into positions of influence. In addition, they go to great lengths and great expense to promote those who are especially talented in these efforts. Without credible evidence

of their effectiveness in destroying their opponents and victims by the means of their shadow administration and shadow players. Thus, the continuing nature of the complaint is not only clearly established but avidly proclaimed by the Defendants.

**D. Standing to invoke Colorado Defamation.**

The standard for Defamation in Colorado was defined in *Keohane v. Stewart, 882 P.2d 1293 (Colo. 1994)* as, *"a communication holding an individual up to contempt or ridicule that causes the individual to incur injury or damage." The* elements for a claim of defamation in New York require that the statements be false statements of fact relating to the Plaintiff, that the statements be published to third persons, and made with at least negligent disregard, and the result of the defamation must show material harm.

Colorado treats Defamation as an intentional tort, and except in *Defamation Per Se* situations, the Plaintiff most prove the defamatory nature of the reports. Colorado recognizes four types of statements as per se defamatory: a) accusations of having committed a crime or crimes, b) accusations of having an infectious disease, c) accusations of sexual promiscuity or unchastity, and d) accusations meant to prejudice the victim in his profession, trade, or business.

All four of these Per Se Defamatory accusations were and are regularly and persistently made against the Plaintiff. Specifically, the crimes cited in regard to the Plaintiff included: a) accusations of rape, murder, spousal abuse, and physical violence against others and were quite common throughout the whole experience, (b) though less common but generally present were accusations of being infected with AIDS or sexually transmitted Herpes due to his alleged promiscuity, (c) the most common included accusations of particularly disgusting perversions, homosexual promiscuity, heterosexual promiscuity, and adultery, and (d) finally accusations of having cheated throughout the Plaintiff's career both in graduate school and as an instructor in community colleges or of having completely falsified his background to cover time spent in prison or time spent as a wandering indigent.

The acts of extortion experienced by the Plaintiff at the hands of the Defendants and described in Section III STATEMENT OF CLAIM of this Complaint were perpetrated by dozens of actors and against the Plaintiff and other victims as the prime source of their audience share, marketing, advertising and profits. In addition, they go to great lengths and great expense to hire those who are especially talented in these efforts. Without credible evidence of their

21

effectiveness in destroying their opponents and victims by the means of their shadow admin and shadow players. Thus, the continuing nature of the complaint is not only clearly established but avidly proclaimed by the Defendants.

The standard for Colorado defamation was defined in *Keohane v. Stewart, 882 P.2d 1293 (Colo. 1994)* as, "a communication holding an individual up to contempt or ridicule that causes the individual to incur injury or damage." The elements for a claim of defamation in Colorado require that the statements be false statements of fact relating to the plaintiff, that the statements published to third persons, and made with at least negligent disregard, and the result of the defamation must show material harm. Damage may be in the form of economic loss, damage to reputation or both. Colorado treats a defamation case as an intentional tort, and except in *defamation per se* situations, the plaintiff must prove the defamatory nature of the reports; however, defamation per se claims are so inherently egregious as to be immediately recognized as defamatory and the Plaintiff does not have to prove material harm as it is assumed.

Colorado recognizes four types of statements as per se defamatory: a) accusations of having committed a crime or crimes, b) accusations of having an infectious disease, c) a accusations of sexual promiscuity or unchastity, d) accusations meant to prejudice the Plaintiff in his profession, trade, or business. All four of these per se defamatory accusations were regularly and persistently made against the Plaintiff. The crimes cited in (a) included rape, murder, spousal abuse, and physical violence against others and were quite common throughout the whole experience, those in (b) were less common but generally concerned AIDS of herpes, those in (c) were the most common and included accusations of particularly disgusting perversions, homosexual promiscuity, heterosexual promiscuity, and adultery, and those in (d) generally comprised accusations of having cheated throughout my career both in graduate school and as an instructor in community colleges or of having completely falsified my background to cover time spent in prison or time spent as a wandering indigent.

These accusations are commonplace with other targets of the wrath of the shadow community among those who also refuse to conform to the shadow administrations unwritten of "being in charge," their rules of hierarchy, crimes, and punishments that pervades the community nationally and internationally.

22

Colorado allows for exemplary or punitive damages if the defamatory act is intentional or malicious. Punitive damages are intended to punish the wrongdoer and discourage future behavior.

**E. Citing Colorado Sexual Harassment Laws.**

Sexual harassment is also a prohibited action under Colorado's Anti-Discrimination Act, Co. Rev. Stat. Sec. 24-34-402. The Anti-Discrimination Act prohibits sexual harassment in the workplace (community) regardless of employer size. Even employers who have fewer than 15 employees and are thus exempt from Title VII are governed by the Anti-Discrimination Act. Churches and other religious employers are exempt from the law unless they receive public funding, however, the policies and procedures established and supposedly enforced by the community itself both match the Colorado statute in all its provisions and exceeds it, so it must be concluded that said policies and procedures are a de facto acceptance of the Colorado Statutes.

Sexual harassment is a prohibited action under Colorado's Anti-Discrimination Act, Co. Rev. Stat. Sec. 24-34-402. The Anti-Discrimination Act prohibits sexual harassment in the workplace regardless of employer size. Even employers who have fewer than 15 employees and are thus exempt from Title VII and are governed by the Anti-Discrimination Act.

In particular these State and City laws state that any person who intentionally selects a person or property for harm or causes damage to the property of another or causes physical injury or an imminent threat to a person or property, in whole or in substantial part because of a belief or perception regarding the membership in a protected class of a person, regardless of whether the belief or perception is correct, shall be liable, in a civil action or proceeding maintained by such individual or group of individuals, for injunctive relief, damages, or any other appropriate relief in law or equity.

**F. Citing Colorado State and Federal Civil Rights Statutes.**

Filing claims under Federal Civil Rights Statutes ordinarily requires the filing of a formal complaint with the EEOC before such an action is allowed in the Federal Courts; however, as the situation within which the torts and crimes originated was a religious community rather than a workplace or a university such complaints are unavailable to the

23

Plaintiff and others in a similar position as the EEOC covers only workplaces and universities which choose to adhere to their statutes. Shambhala International as a religious community is not at all like one might expect of a neighborhood Christian church where parishioners assemble once a week and watch and listen to a single prelate for a single hour and all discourse between the parishioners is limited to a few minutes before and after the services.

Many of the teachers develop personal followings that can be almost cult-like in nature and competition among different teachers and the followers of different teachers becomes a further source of gossip, and as gossip is essentially the sole means of gauging the popularity and thereby his/her effectiveness is through gossip it takes on a dimension of importance that is unknown in most universities and work places. As it is also the means by which teachers advance and earn regular engagements and the travel benefits that offers, the teachers seek to manage the gossip to their favor.

It is in this environment that the Plaintiff, against his will, became a central focus of the worst of all of it. Much of it fueled by the growing knowledge of an exploitation of the phenomenon of mobbing and bullying where particular targets are singled out as pariahs. As one practioner explained, "once you make someone the pariah it takes the pressure off everyone else. He said this to the Plaintiff to indicate that many people knew he had been singled out for abuse and simply did not care if he protested and simply would not stop.

Given this lack of access to EEOC complaint procedures and given the abuses of the community complaint system described herein, the Plaintiff argues that the lack of access to the EEOC, leaves a direct approach to the federal courts as his only option to redress the situation and assert and reclaim his legally protected rights.

**G. Citing RICO Statutes under Colorado Extortion Laws.**

Standing to invoke the RICO Statutes is derived from the Civil Remedies portion of the RICO Act, 18 U.S. Code § 1964 (c) which states "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court." Extortion is one of the criminal acts included under RICO (discussed in detail in Section IIA5 of this Complaint) § 1962(d) and is invoked in this matter concerning the specific predicate acts required to establish standing to cite RICO 1964(c) which allows a private citizen to file a civil complaint under the RICO statutes.

Section 1962 lists the prohibited activities under the RICO Act and includes extortion as one of the criminal statutes which are chargeable under State Law and which are required to be punishable by imprisonment for more than one year. Colorado Revised Statutes Title 18. Criminal Code § 18-3-207. (Criminal Extortion--Aggravated Extortion) states that the acts described in that statute are subject to a penalty of at least one year in prison, thus satisfying that requirement for a determination of the applicability of a statute to serve as a source for claiming the presence of relevant RICO predicate acts under 1964(c).

The Plaintiff must also demonstrate that through the violation of the RICO statute, he suffered an injury to his business or property and that the injury was caused by the violation of the statute. The injuries to the Plaintiff and their direct relatedness to the criminal enterprise under consideration comprise injuries to his career, reputation, and person as a direct result of Plaintiff's failures to comply with the conditions of the threats proffered by the Defendants. The particulars of the harms incurred by the Plaintiff are detailed in Section IV of this Complaint, but briefly stated, they comprise hundreds of thousands of dollars in lost wages and loss of enjoyment and participation in family, social, and professional life.

A Plaintiff must also prove a relationship between the acts of racketeering activity charged, a threat of continuing activity, and a clear link between the claimed violation and the Plaintiff's injury. The numerous violations of that statute perpetrated against the Plaintiff as described in Section III of this Complaint and clearly perpetrated by the members of the criminal enterprise described herein are so numerous as to defy calculation and clearly satisfy the requirement that a pattern of activity be established. 18 U.S.C. § 1961(5).

The RICO Act further stipulates that the requisite substantive offenses be committed by an identified criminal enterprise requiring the Plaintiff to demonstrate: a) the existence of an enterprise that affects interstate or foreign commerce, b) that the Defendants were employed by or associated with the enterprise, c) that the Defendant's participated in the conduct of the enterprise's affairs, d) that such participation was through a pattern of racketeering activity, and e) the use of any part of that income in acquiring an interest in or operating the enterprise.. The RICO Act only requires proof of the Defendants' association with the illegal activities of the enterprise but not necessarily contractual employment and associated outsiders who participate in these affairs of the racketeering enterprise may also be held liable for a RICO violation.

Working contrary to all the stated policies and procedures of the community within
which they work and that of the United States civil and criminal law, the perpetrators form
shadow administrations within their institutions with shadow participants that openly defy and
violate the well-known and legally mandated policies and procedures against such behaviors
and the relevant civil and criminal laws. They perpetrate these violations as a means to advance
themselves and their network into positions of power and influence and to eliminate those who
might challenge or oppose them in this regard.

In general, civil RICO provisions are inapplicable to claims for damages or economic
losses arising from personal injuries such as physical injury, emotional distress, loss of
consortium, and wrongful death. However, in the District of Columbia, an award of punitive
damages is permissible when there is a valid basis for an award of compensatory damages.
"Where a Plaintiff has sustained actual damages, he may obtain punitive damages by showing
that the defendants acted with gross fraud, wantonness, maliciousness, or willful disregard for
the rights of others."

It may be of value to note that a civil RICO lawsuit in this matter as these sorts of
shadow criminal enterprises are acting in this regard like past labor unions that became infested
with organized crime and where injunctive relief and structural reform was necessary to
eliminate extensive and prolonged abuses of this sort. In those cases, civil RICO's equitable
remedies, especially injunctive relief, removal of corrupt union officers and members, and the
appointment of court officers to administer and oversee aspects of the unions' operations,
achieved substantial success in eliminating and reducing such corruption within the unions
involved and related businesses.

The named Defendants have absolutely no boundaries when it comes to getting their
way via extortion through numberless threats and acts of defamation against those who get in
their way and such an interpretation of the actions of their attorneys is inevitable.

**H. Conclusion.**

It is necessary to conclude that not only are the allegations of the Plaintiff plausible, they
are quite likely, and that the pressure of the law and the Court represented in the advancement
of this Complaint to Discovery will allow the Plaintiff to present known evidence and likely
dislodge significant further evidence to support the Plaintiff's allegations in far greater detail

and to reveal more perpetrators as well as encourage those many witnesses who are aware of the Plaintiff's situation as well as similar situations with others will take the courage to come forward without fear of the same harassment and discrimination being visited on them, their families, and their close cohort and friends. as well as to expose a very dangerous form of criminal enterprise that exists within spiritual communities and their established networks in the communities in which they abide. This will also encourage those many witnesses who are aware of the Plaintiff's situation as well as similar situations with others to take the courage to come forward in the face of threats of the same harassment and discrimination being visited on them and their families, and their close cohorts and friends because of this complaint.

As it is, members of the communities in which the Plaintiff lived and worked are quite aware of these torts and crimes, they too are as concerned about coming forward as those already mentioned in a matter analogous to citizens living in a community dominated by organized crime or a similar sort of underground, which is precisely the effect the perpetrators seek to effect in order to expand their ability to advance and promote themselves at the expense of the law abiding community.

While the recognition of these dynamics and the specific instances of their implementation as concerns the Plaintiff are particularized, a generalized awareness of these problems in multitudes of neighborhoods, corporate environments, workplaces, universities, and, of especial concern within elementary and secondary institutes of education, as to make this matter not only one of pressing national concern, but one that is so well known and so pervasively proliferating as to compel the argument that the best interests of the Plaintiff in this case and of the nation in general are best served by invoking Federal Rule of Evidence 301, Presumption, and insisting that the burden of proof falls primarily on the Defendants.


**IV. INJURIES:**

The following description of injuries is quoted from the Bralich v Gayner law suit on the argument that the 2021 and 2022 injuries incurred from the Boulder Public Library are a continuation and exacerbation of those torts and crimes and thus the same still holds.

From Bralich v. Gayner:

**1. Wages.**
In spite, of sound education, training and experience, the Plaintiff's resume is riddled with gaps of between a few months or a year or more in which he could not work

27

in his chosen career of linguistics/language teaching. These were due to the problems
encountered in the work place which were riddled with the specific threats, harassment,
and discrimination promulgated within the Defendants' viewers and followers'
communities and which compromised his professional and social standing and made him
a prime target for cut backs and layoffs. In spite of these gaps, the Plaintiff continued to
enhance his experience in relevant areas and increase his skills in training including a
Master's degree and a Doctorate in theoretical linguistics. Of particular note was his
partnership with a renowned theoretical linguist (Professor Derek Bickerton) to author
and then develop into a software suite a full theory of syntax for the purposes of
grammatical analysis in natural language search engines. He won a patent for the
software suite and raised over $500,000 in grants and investments including a finalist
position for a federal 1.5 million-dollar ATP grant to bring the software suite to
completion.

      In 1983, when the abuse was just beginning he settled in Boulder, Colorado
hoping to pursue his career in tandem with the Buddhist studies but after just six months
the harassment and abuse started at SMC had spread to Naropa and the Boulder
Shambhala Center and from there throughout the communities Plaintiff inhabited and
beyond and had become so pronounced that he was forced to leave. Shortly, thereafter
he moved to Honolulu where he earned a masters and Ph.D. in theoretical linguistics, but
there too through the both the Zen and Tibetan Buddhist centers he attended the
outreach of the Shambhala community severely damaged his reputation with those
centers and the university among classmates and professors. Several substantial and
publishable projects were not supported and were ignored due to the harassment.

      His last position was at the renowned Army language school in Monterey,
California (the Defense Language Institute and Foreign Language Center) in which he
taught foreign language learning and in which he won a Commandant's Coin for
Excellence for spearheading their 2006 accreditation drive. However, the Defamation
discussed above reached into the institute, and he was laid off after only three years in
spite of a very strong contribution. Since then, The Plaintiff tries to make a decent living
as a free-lance writer having given up in frustration of ever being able to free himself of
the harassment. All of this continued in like manner and continues to the present as
represented by the current complaint.

## 2. Current and Future Pain and Suffering.

      It is highly unlikely, even after measures such as represented by this law suit,
that The Plaintiff will ever escape the ongoing pressures or recover from the effects of all
that has occurred and is occurring and the emotional distress must necessarily be
considered substantial and enduring and representing a permanent disability. The
symptomology representing this permanent disability include but are not limited to
hypervigilance, defensiveness and a defensive posture, fear, grief, worry, anguish,
shame, personal and public humiliation, embarrassment, severe disappointment, despair,
indignation, wounded pride, anger, torment, anxiety, depression., inconvenience,
diminished quality of life, the loss of much of the enjoyment of life including the enjoyment
of holidays and special occasions, loss of either receiving or tendering ordinary love and
affection, care, and companionship, loss of the possibility of imparting parental
knowledge or guidance, loss of possibility of spousal intimacy, fears of and defensive
postures against false imprisonment, malicious prosecution, assault, battery, rape, and
murder, distress over disability and its continuance, exacerbation of, inability to recover
from, and new sources of PTSD, fears of homelessness, an unrecoverable good
reputation, career, social life, and family life, being labeled or having a reputation as a
sexual deviant, criminal or an ex-convict, inability to own or run a business, loss of
consortium with family members, and social isolation and fears and distress concerning
social engagement. All of which The Plaintiff has experienced in extreme degrees and is
likely to continue to experience as though he had the mark of Cain on his forehead or
scarlet letter "A" on his shirt, or a disfiguring and identifiable scar on the face.

All of the above have been deliberately and severely aggravated and added to through the abuse described herein. The symptoms of PTSD as described by the Plaintiff to his psychiatrist are primarily, but not exclusively, a constant and intense sense of panic that at any moment, something, even the tiniest thing, might occur to once again place him in the position of the loss of everything and total debilitation preventing him from doing anything to recover. This ever-present sense of panic requires constant and intense vigilance of everything and everyone in order to recognize and prevent the reoccurrence of the original trauma either minor or major that will once again launch him into that position of helplessness.

Many of the members of the community of Defendants were well aware of the PTSD and the story behind it as well as The Plaintiff's triumphs in achieving a Ph.D. and work in academia in spite of it. For those who were not personally informed, it would have taken very little investigation to learn this, and certainly, if they had even tried to discuss these matters with The Plaintiff, he would have been open and forthcoming about it. There has also never been any sane reason for anyone to suspect criminality, sexual deviance, predation, or membership in the LGBT community either past or present in The Plaintiff's behaviors or demeanor or in his spoken reports of himself.

While the symptomology of PTSD was and is always present, it is well-known that PTSD is not the sort of difficulty (except perhaps for that induced in combat in military service) to cause behavioral or criminal problems. In fact, the primary presentation of such a person is a flat affect, a frozen countenance, and withdrawal, all of which The Plaintiff exhibits. The Plaintiff's participation and decorum at programs and activities in the community was always above average. The survival guilt and pathological guilt were used as "proofs" of The Plaintiff's self-knowledge of alleged criminality and an otherwise sordid past, and of particular cruelty was the transformation of knowledge of the death of his wife in the accident into allegations of murder.

Many of the perpetrators spoke to him in person and at a distance through cat-calling to inform him that the abuse was indeed deliberate, that he had become a chosen target, and that it would not stop. One person made one of the clearest statements about the purpose and goal of the abuse when he stated, "Once you make one person the pariah, it takes the pressure off everyone else."

## V. REQUEST FOR RELIEF:

The following also quotes the monetary calculation from the related suit in Bralich v Gayner, and afterwards specifies a significantly smaller portion for the role played by the staff of the Boulder Public Library.

Specifically, as per current standards, the monetary compensation sought in this matter is based first off on lost wages and secondly on punitive damages for the extremes of mental anguish that were deliberately and laboriously inflicted and which far exceed all bounds of human decency and what can be tolerated by civilized society. In addition, said mental anguish was inflicted by the Defendants in spite of training, education, degrees, and experience that indicate quite clearly that the Defendants were quite cognizant of the wrongful nature of their actions and that the natural expectation of the ordinary citizen would be to expect them to conduct themselves as authorities and experts in those regards and to expect them to defend innocent individuals against such actions rather than gleefully and assiduously indulge them without the slightest regard for the known principles of fairness and justice of U.S. jurisprudence, which they would also be expected to know and espouse in their very prominent public positions.

Such behaviors were the source of the Plaintiff's loss of wages and physical and emotional distress and, in total, relief is calculated at $72,000,000.00 as described next calculated as follows.

29

Had the Plaintiff's career progressed without the harassment, his contributions to the field would have led, conservatively, to a career as a full-time professor in a state college and would have earned him approximately $1,800,000 figuring an average of $60,000 per year over a full career which typically begins around $40,000 per year and closes off around $75,000. Assuming he had had a spouse with a similar career during this time, that figure would be doubled for the household income.

This is a conservative estimate as published estimates of the average professor salary across all school types and subjects differ depending on which organization is calculating the data. According to PayScale, an American compensation software and data company, the median pay for a professor in postsecondary education is $87,018. The U.S. Bureau of Labor Statistics, citing its 2018 data, put the median number at $78,470.

As it was, the Plaintiff rarely made more than the minimum hourly wage for adjunct professors of about $20 per hour in multiple part-time jobs to equal the pay of a full-time job and without benefits when in his field but often worked at minimum wage jobs such as the Barnes and Noble Bookstore when he was unable to work in his field due to the harassment. Thus, roughly speaking had it not been for the harassment, he would have earned between $1,800,000 to 3,600,000 in wages in the software industry.

His most important contribution to the field of linguistics was the development of the software suite of grammar analysis tools that should have led to a career as a linguist in the software industry with a conservative estimate of an annual income of around $120,000 which over 30 years would have been $3,600,000.

Thus, he would have earned between $1,800,000 to 3,600,000 in wages between academia and the software industry, so the median number of $2,400,000.00 is proposed by the Plaintiff as a fair and acceptable amount to express the amount of lost wages.

Using the higher standard number of 5 for a multiplier to determine punitive damages in such cases due to the intentionality and egregiousness of the abuse, the amount for lost wages is calculated at $2,400, 000 (the midpoint between the two totals just cited) x 5 or $12, 000,000.

As for Punitive Damages concerning the lost wages, the Plaintiff suggests using the standard higher standard number of 5 for a multiplier in such cases due to the patent intentionality and egregiousness of the abuse, and thus, the full amount for lost wages is calculated as $2,400,000 x 5 or $12, 000,000. For the compensation for pain and suffering due to the <u>damages</u> as described above, Plaintiff suggests that simply doubling the number calculated for lost wages as a fair and acceptable compensation of another $12,000,000 and a total of $24,000,000.

In addition, the Plaintiff further humbly and respectfully requests the Court to grant the full measure of the treble damages associated with a RICO claim due to the necessarily coordinated, organized, and systematic dissemination of this widespread network of discrimination, sexual harassment, and the encouragement of criminality in others in what can only be described as a kind of a Mafia-by-Proxy sponsorship, not only harassment and discriminatory practices towards others but sexual and physical violence as well. For the aforementioned total of $4,500,000.

In the case of the current lawsuit and based on the above calculations, the Plaintiff submits that a correct amount for the damages accruing from the Boulder Public Library repetition of these torts and crimes should be $3,000,000. Specifically, the Plaintiff humbly and respectfully calculates compensation in the form of monetary relief in the amount of $1,500,000 for lost wages and professional opportunities which he doubles for the pain and suffering to $3,000,000 and then multiplies this number by three as per the RICO statutes to $9,000,000.

## V. DEMAND FOR INJUNCTIVE RELIEF.

In addition, the Plaintiff humbly and respectfully requests a preliminary and permanent injunction against all Defendants concerning any and all speech both written and verbal that will either continue or exacerbate the matter. The temporary injunction is requested as soon as possible after the filing of this complaint.

## VI. DEMAND FOR JURY TRIAL.

The Plaintiff demands a jury trial for all causes so triable.

## VII.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have personally written this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Signed this 25th Day of July, 2022 at Boulder, Colorado.

Signature of Plaintiff:
Mailing Address:     2525 Arapahoe Avenue, E4-163
                     Boulder, CO 80302
Telephone Number:    (831)641-9610
Email:               pbralich@earthlink.net

31

**Philip A. Bralich, Ph.D.**
2525 Arapahoe Avenue, E4-163
Boulder, CO 80302
Telephone: (831)641-9610

---

pbralich@earthlink.net

July 28, 2022

Court Clerk
District of Colorado
Alfred A. Arraj
United States Courthouse
901 19th St
Denver, CO 80294

Re: Filing of Initial Complaint

To the Court Clerk of the District Court of Colorado:

Enclosed, please find the necessary paperwork for the filing of an initial complaint with the
United States District Court of the District of Colorado. In addition, I have appended a change of
address form for a previous case t

If possible, could you also notify the CM/ECF department that I have an open, updated Pacer
account and would like to file via that system as well.

Thank you very much for your kind consideration of this matter.

Sincerely,

Philip A. Bralich, Ph.D.

Encl:

Civil Cover Sheet
Summons
Waiver of Summons Form
Complaint
Request to Proceed IFP
Change of Address Form

1